RECEIVED
IN LAFAYETTE, LA.

JUL 2 4 2012

TONY R. MOORE, CLERK
BY_____
            DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SHAUN CAMPBELL                          CIVIL ACTION NO.: 11-1358

VERSUS                                  JUDGE HAIK

CHET MORRISON                           MAGISTRATE JUDGE HILL
CONTRACTORS, LLC

---

## REASONS FOR JUDGMENT

On July 22, 2011, Plaintiff, Shaun Campbell (Campbell), brought suit against his former

employer, Chet Morrison Contractors, LLC (Morrison), for injuries arising out of an accident

that occurred on a fixed platform in the Gulf of Mexico while he was attempting to remove and

replace Ball Valves as a Dive Tender. Campbell brought suit under the Admiralty Laws of the

United States of America, the Jones Act, and General Maritime Law, alleging Morrison's

negligence and the vessel's unseaworthiness. Campbell also designated this action in Admiralty

within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. A bench trial was held

on June 11, 2012 and concluded on June 13, 2012, taking the matter under advisement. For the

reasons fully asserted below, the Court holds Morrison 100% negligent for Campbell's injury

and the vessel unseaworthy on the date of injury.

### I. Facts

Campbell is a thirty-three-year-old man with a fourteen-year-old daughter and living with

his long-term girlfriend in Arizona. At the age of twenty-one, Campbell joined the military and

served this country for six years, with his latest rank being E4 Petty Officer Third Class. While

in the military, Campbell was initially a Naval Hospital Corpsman in charge of the overall

1

healthcare of Navy and Marine Corp soldiers and sailors. Campbell then completed two tours of duty in Iraq and Kuwait in Operation Enduring Freedom and Operation Iraqi Freedom. After his combat tours overseas, Campbell joined the prestigious Navy Parachute team.

Upon his honorable discharge, Campbell sought a career in the commercial diving industry due to his love of the water, with a goal of ultimately becoming a saturation diver and then a dive supervisor. Campbell began his employment with Morrison in July 2008 as a Dive Tender. Duties of a Dive Tender include, but are not limited to, tending the diver's umbilical, being aware of the diver's depth and location at all times, inspecting docks and dive equipment, repairing vessels below water line, replacing missing or leaking rivets with bolts, placing rigging around sunken objects and hooking the rigging to crane lines, and inspecting and repairing underwater pipelines, cables and sewers.  According to Morrison's official job description, these tasks require tenders to use their hands and fingers to handle or feel both on the vessel and under the water. Unfortunately, after approximately two and half years as a dive tender, Campbell was injured.

On October 20, 2010,[1] Campbell was aboard the JoAnn Morrison, a vessel leased and/or chartered by Morrison. On that day, Campbell and his co-worker, Wade Jones, were assigned the task of removing and replacing Ball Valves on East Cameron 328B platform, a fixed platform off the Gulf of Mexico. This platform was approximately a half-mile from the vessel, requiring the men to take a tug boat with their tools to the platform. Morrison's Saturation Diving Superintendent, Larry Hively, and Dive Supervisor, John Allsbrooks, accompanied Campbell and Jones to the platform. Once on the platform, at around 6:00 p.m., a standard platform safety

---

[1] The exact date of injury is uncertain. Campbell claims the date of injury was October 20, 2010, while Morrison alleges it was October 21, 2010. This slight variance makes no impact on the result of this case and the Court presumes the incident occurred on October 20, 2010.

orientation meeting was held followed by a quick five-minute "tool box safety meeting" on the platform, which was standard practice regarding the task objective. At no point, however, did Hively or Allsbrooks instruct the men on how, specifically, to perform this project or how to position themselves to remove the ball valves. The men were then required to step over a handrail and shimmy down a riser to get to the work location that was approximately seven feet below the elevation of the platform catwalk or Plus-10 deck.

To perform the task, Campbell and Jones were given sledge hammers and hammer wrenches to manually break apart the ball valves. Use of the sledge hammer and hammer wrenches required the men to swing the sledge hammer overhead,[2] with the men breaking and switching off approximately every fifteen hits. Both Campbell and Jones described the work as physical labor and exhausting, causing them significant fatigue. Both men also described the work area as confined and "awkward," requiring them to either stand one foot atop the other on a triangular gusset, as Campbell did, or have one foot on top of a standoff, a circular piping structure, and one foot on top of a riser clamp, as Jones did.[3] According to Morrison's safety policy, however, Jones's footing on top of a standoff is discouraged.[4] Campbell alleges that the lighting at the worksite was poor and testified that he had difficulty seeing the hammer wrench at times. Jones, Hively and Allsbrooks all testified the lighting was adequate due to the sodium light on the platform. In Jones's words, however, the job was "caveman-ish."

---

[2] Campbell and Jones's testimony regarding swinging the sledge hammers differed slightly as to the motion of the sledge hammer. Particularly, while Campbell began his swing with the hammer above his head, Jones began his swing over his shoulder like a baseball bat. Notwithstanding, it was clear from the testimony that both men raised the sledge hammer above their head during their swing. In fact, both men testified that the flange was approximately two and a half feet away from them and two and a half feet above them, requiring them to make contact with the flange above their heads.

[3] At one point the men attempted to remove the ball valves by lying down on the platform grating, but that proved unsuccessful. As a result, the men moved back down the risers below the elevation of the grating.

[4] Employees are discouraged from "[c]limbing or standing on equipment hoses, piping, or valves."

Once the job commenced, Hively left the men to seek out the platform crew supervisor, while Allsbrooks stayed behind and monitored the work. After observing the men's fatigue of swinging an eighteen-inch, twelve-pound hammer for approximately two and a half hours, Allsbrooks aided the men below the platform and placed both of his feet on a standoff. The grueling task of swinging the heavy hammer overhead within a tight and awkward working space lasted approximately three hours, or until approximately 10:30 p.m., before Campbell injured himself by swinging the hammer into his right index finger.[5] Both Hively and Allsbrooks, who were on the platform in a supervisory capacity the entire three hours, testified that they were unaware the men were swinging the sledge hammers overhead and would have stopped the job had they known this fact.

After his injury, Morrison sent Campbell for treatment to Dr. Jonathan Shults, an orthopedic surgeon. Campbell's finger was splinted and he was referred to physical therapy. Once physical therapy did not improve his injury, Campbell underwent surgery on November 20, 2010 followed by five months of rehabilitation. Due to his lack of improvement, Dr. Shults referred Campbell to Dr. John Hildebrand, an orthopedic surgeon, who recommended a second surgery. Thereafter, Campbell underwent a second surgery on May 20, 2011. After five months of physical therapy, Campbell moved to Arizona, where he currently treats with Dr. Mark Mellinger, an orthopedic hand specialist. Although Dr. Mellinger has recommended yet another surgery for Campbell, Campbell testified at trial that he does not want his index finger surgically removed or fused.

---

[5] There is a dispute as to how far along the men were on the project and what flange they were working on at the time of Campbell's injury; however, this disparity is of no consequence to the ultimate outcome of the case.

As a result of Campbell's injury, his index finger's flex and extension is limited. The Court observed Campbell the entire trial and Campbell did not make a closed fist with his injured hand for three days. Campbell testified that he is required to take Nucenta, a class II narcotic pain medication, to cope with his "all day, everyday" pain that radiates from his injured finger through his entire body and causes persistent headaches.  According to Campbell, this pain has affected his relationship with his girlfriend and also prevents him from enjoying his previous outdoor activities and hobbies such as golf, rock climbing, mountain biking, hiking and camping. Campbell also testified that his injury has affected his ability to sleep and has caused him to lack motivation. Campbell has not been employed since his accident, but intends on attending a two-year program in the fall to become a radiography technician.

## II. Campbell's Argument

Campbell argues that his injury was caused by no fault of his own, but rather by the negligence of Morrison and the unseaworthiness of the vessel.

Campbell's main contentions of negligence and unseaworthiness include the tools used to perform the project and the unsafe working surface. Specifically, Campbell argues that pneumatic tools[6] should have been used to remove and replace the ball valves instead of hammers and hammer wrenches. Campbell asserts that the use of pneumatic tools would have been a safer and quicker alternative. This assertion was reiterated by Campbell's mechanical engineering expert, Gregg Perkin, who testified that Campbell and Jones should have been given pneumatic tools to perform this project. Campbell testified that prior to leaving the vessel, he inquired into using pneumatic tools but was only given a hammer and hammer wrench. According to Jones, bringing over the pneumatic tools to the worksite would have been simple,

---

[6] A pneumatic tool is a tool driven by a gas, usually compressed air supplied by a gas compressor.

taking only "minutes." However, no pneumatic tools were brought over to the platform until the relief crew arrived that evening to finish out the project.

Campbell also takes issue with the lack of a compressor needed to operate the pneumatic tools since both of the vessel's compressors were in use. To support his argument, Campbell points to Hively's testimony, who stated that he intended to use the compressor located on the platform; he was "90% sure" there would be a compressor on the platform. In fact, Hively testified that his project manager informed him there was a compressor on the platform. Campbell argues that although Hively had radio contact with the platform from the vessel, and, in fact, called the platform before heading over to the platform to tell them they were coming, he did not inquire as to the availability of the compressor. Hively did not seek out the use of the compressor until he was on the platform because those negotiations tend to take place "face-to-face." Hively then spent a considerable amount of time seeking out the crew supervisor on the platform to negotiate use of the compressor. Hively finally secured use of the compressor one hour before the shift ended. However, Hively never informed Campbell or Jones of the permission to use the platform compressor because he did not want to give them false hope of using pneumatic tools.

Campbell also maintains that the work area was dangerous and should have included scaffolding to provide him with balance and stability. According to Mr. Perkin, the work area was "not a working surface" and testified that Morrison should have provided its employees with a fixed and firm work area, such as providing scaffolding or handrails. Furthermore, Mr. Perkin stated that it is industry practice not to allow employees to stand on piping, as Jones and Allsbrooks did.  Campbell argues that it is this lack of a safe working surface that required him to balance one foot atop the other, ultimately leading to his injury. Furthermore, Campbell

6

asserts that Hively and Allsbrooks failed to properly supervise him and give him proper instructions and should have stopped the project.

Campbell further asserts the work area was unsafe due to lack of lighting for this night-time project. Campbell testified that the lighting for the project was poor and he had difficulty seeing the hammer wrench at times while working. To support this argument, Campbell points to Allsbrooks' testimony, wherein he testified that it was necessary to use a flashlight to read the writing on the flanges being worked on.

Campbell also contends that after the accident, he was unable to properly care for his injury because the vessel contained inadequate medical supplies. Furthermore, Campbell was not brought to shore for treatment until October 26, 2010. Campbell asks this Court to find that this delay was unreasonable and was a proximate cause of Campbell's injury.[7] For all of these reasons, Campbell prays that this Court finds Morrison negligent for his injuries and the vessel unseaworthy.

## III. Morrison's Argument

Morrison ultimately argues that it carries no liability and that Campbell's injury was 100% attributed to his own negligence. With regard to the use of hammers and hammer wrenches, Morrison points to the testimony of Hively, Allsbrooks, and Jones, all of whom stated that it is commonplace and standard practice in the industry to utilize a hammer and hammer wrench as tools to break nuts and bolts on the flanges of a riser. Terry Overland, Morrison's commercial diving operations expert, also testified that the use of hammer wrenches to loosen flanged bolts is a common, accepted and appropriate practice in the offshore construction

---

[7] Aside from Campbell's testimony that the vessel carried inadequate medical supplies, no evidence was presented that this alleged lack of medical supplies or delay in getting to shore exacerbated Campbell's injury. For this reason, the Court rejects this contention and will not address this allegation further.

industry. Morrison denies that Campbell ever inquired into the use of pneumatic tools prior to leaving the vessel. Notwithstanding, Morrison relies on Hively's testimony that on most occasions pneumatic tools do not appropriately break nuts from bolts, requiring use of a hammer and hammer wrench to break them loose. Mr. Overland stated that in most cases pneumatic tools are insufficient to break rusted nuts from the all-thread bolts because they do not generate sufficient torque.

With regard to the work area, Morrison vehemently denies the area was unsafe or unstable. Mr. Overland testified that the work area was stable and he did not think scaffolding could have been erected in the work area due to the confines of space. Furthermore, Morrison points to testimony that revealed that it was not necessary for Campbell to stand as he described with one foot placed on top of the other. For example, Jones and Allsbrooks stated there was adequate footing to do the job; there were fixed bolted riser clamps of sufficient size to enable one's entire foot to fit atop the cap of the clamp. In fact, Mr. Overland testified that the riser standoffs, in particular, provided adequate footing for two persons to work safely on the riser using hammers and hammer wrenches.

Morrison further argues the work area was well-lit. Jones testified the area was sufficiently lit and that he could see where he was striking the hammer wrench. Similarly, Allsbrooks stated the lighting was "perfectly adequate." Morrison also points to the sodium light on the platform.

Morrison contends that, had the work area been unsafe, Campbell should have requested an all-stop. Furthermore, Campbell testified that he used a hammer wrench in the past and did not need further instruction on how to use it. For that reason, Morrison asserts that Campbell

received proper supervision. Ultimately, according to Morrison, Campbell hitting his own finger is attributed to his own carelessness or inattentiveness.

## IV. Motions in Limine

### A.  Campbell's Motion in Limine and Trial Objection to Expert Testimony

On May 11, 2012, Campbell filed a motion in limine seeking to exclude photographs of the work area taken after the accident and video surveillance of Campbell. Campbell argues that these exhibits were added after the filing of the Pre-Trial Order, which was filed on March 20, 2012, and untimely disclosed. Pursuant to the Scheduling Order, the discovery deadline (phase I and II) was February 26, 2012. The Court ruled in open court on the exclusion of the photographs on the first day of trial prior to Campbell's case-in-chief. The Court then ruled on the exclusion of the video surveillance during trial as the issue arose.

*1.  Photographs*

On April 18, 2012, approximately one month after filing the Pre-Trial Order and two months after the discovery deadline, Morrison had its expert, Mr. Overland, and fact witness, Jones, who had already been deposed, visit the platform where the injury occurred. Photographs of the worksite were taken and Morrison disclosed this information in a Supplemental Expert Report on May 8, 2012. Campbell requested this Court exclude any testimony and evidence arising out of conduct that occurred after the Pre-Trial Order and untimely disclosed.

After argument on the matter, the undersigned excluded any photographs taken of the platform after the filing of the Pre-Trial Order and submitted after the deadline to disclose exhibits and the discovery deadline. There is a dispute regarding whether these pictures show the condition of the platform at the time of injury. Because the pictures were disclosed so late, Campbell did not have opportunity to depose the platform owner to determine if the condition of

9

the platform had changed between the date of injury and the date the pictures were taken. The late production of these photographs was untimely and, therefore, inadmissible.

### 2. *Video Surveillance*

Similar to the photographs, Campbell requested the exclusion of video surveillance taken of Campbell on April 14-18, 2012, which was after the filing of the Pre-Trial Order.  The video was also taken after Morrison denied having any video surveillance in its responses to Campbell's interrogatories. The 45-minute video, showing Campbell working on his car, was not provided to Campbell's counsel until May 4, 2012. A shortened edited version of the video was used during the deposition cross-examination of Dr. Mellinger, Campbell's treating physician, one month before trial. However, Campbell's counsel was not given a copy of the edited video and did not see the edited version of the video until after Dr. Mellinger's deposition. Furthermore, this Court only received the edited version of the surveillance video and was never presented with the unedited version.

Campbell also argues that he was never given the opportunity to depose the videographer or editor of the video, despite his immediate request to do so. Specifically, on May 7, 2012, three days after receiving the surveillance video, Campbell's counsel contacted Morrison's counsel for available dates to depose the persons surveying Campbell. Morrison never responded to this request, but sent Campbell the records of these individuals instead. For these reasons, Campbell sought to exclude the video and portions of Dr. Mellinger's deposition testimony regarding the video. Conversely, Morrison argues that it sufficiently notified Campbell of the video surveillance and sent him the records of the individuals involved in the surveillance. Morrison also contends that Campbell did not follow proper subpoena procedure to depose those individuals.

10

The Fifth Circuit's seminal case regarding surveillance videotape evidence is *Chaisson v. Zapata Gulf Marine Corporation*, 988 F.2d 513 (5th Cir. 1993), where the Fifth Circuit found the district court's admission of surveillance videotape evidence to be reversible error. There, surveillance video was taken of the plaintiff, who was claiming damages for pain and suffering and loss of enjoyment of life. This surveillance video was not disclosed to the plaintiff prior to trial and ultimately affected her alleged claims. The court noted the distinction between substantive and impeachment evidence, stating that substantive evidence is "that which is offered to establish the truth of the matter to be determined by the trier of fact," while impeachment evidence is "that which is offered to 'discredit a witness . . . to reduce the effectiveness of [her] testimony by bringing forth evidence which explained why the jury should not put faith in [her] or [her] testimony.'" *Id.* at 517, citing John P. Frank, Pretial Conferences and Discovery-Disclosure or Surprise?, 1965 Ins.Law J. 661, 664 (1965). The court found that the surveillance videotape was both substantive and impeachment in nature, and therefore, should have been disclosed prior to trial. *Id.* at 517-18.

Fifteen years later, the Fifth Circuit clarified *Chaisson's* holding in *Baker v. Canadian National/Illinois Central Railroad*, 536 F.3d 357 (5th Cir. 2008). There, the court upheld the district court's admission of surveillance videos that were disclosed after the discovery cutoff and were both substantive and impeachment in nature. The court noted that the holding in *Chaisson* did not stand for the proposition that "surveillance tape[s] disclosed after the discovery cutoff, but before trial, [are] automatically inadmissible." *Id.* at 368-69. Rather, the court in *Chaisson* found that the video was substantive in nature and "held the district court erred by admitting substantive evidence *undisclosed before trial.*" *Id.* at 368, emphasis added. The court distinguished the facts in *Baker* from the facts in *Chaisson*, noting that the videotape in *Baker*

11

was produced nine to ten months before trial, and therefore, properly admitted as substantive evidence. *Id.* at 369.

In light of the holdings in *Chaisson* and *Baker*, the undersigned first focuses on the nature of the surveillance video evidence. While this evidence may have been intended for impeachment purposes, it certainly affects Campbell's claims of injury and pain, and thus, is substantive in nature. This is evidenced by Morrison's failure to cross-exam Campbell with the video while on the witness stand at trial. Furthermore, the surveillance video was used in Dr. Mellinger's deposition, not to discredit Dr. Mellinger, but for substantive purposes. Accordingly, the Court finds the surveillance video to be substantive evidence.

Second, the undersigned looks to the facts in *Chaisson* and *Baker* and notes that the distinction between the two cases lies in the disclosure of the surveillance video. Unfortunately, the fact pattern here does not lie squarely within either case. Unlike the facts in *Chaisson*, the surveillance video, here, was disclosed before trial. Unlike the facts in *Baker*, where the video was disclosed ten months before trial, the video, here, was disclosed only one month before trial. Moreover, unlike *Baker*, where the plaintiff had sufficient time to conduct further discovery, Campbell did not have that opportunity one month before trial. This is evidenced by Morrison's denial of Campbell to depose the individuals responsible for the video surveillance. Because disclosing the surveillance video so close to the trial date is a similar surprise to its complete nondisclosure, the Court is persuaded by the holding in *Chaisson*. Admitting this evidence would be inequitable under these circumstances.[8] Therefore, the video surveillance and portions of Dr. Mellinger's deposition related to the video were deemed inadmissible.

---

[8] In finding inequity, the undersigned reiterates the Fifth Circuit's reasoning in *Chaisson*, wherein the court stated that the "federal rules promote broad discovery so that all relevant evidence is disclosed as early as possible, making

### 3. *Dr. Joseph Serio's Testimony*

During trial, Morrison sought to introduce the expert testimony of Dr. Joseph Serio, a specialist in undersea and hyperbaric medicine, to testify that he would not have cleared Campbell to work as a diver had he known of Campbell's prior medical conditions while in the military. However, Morrison never identified Dr. Serio as an expert witness and did not provide an expert report from Dr. Serio as required by the Scheduling Order. Morrison provided no reason as to why it never identified Dr. Serio as an expert or failed to obtain an expert report. At trial, Campbell objected to Dr. Serio's expert testimony.

Federal Rule of Civil Procedure 26(a)(2)(A) provides in pertinent part that "a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Rule 26(a)(2)(B) goes on to state that this disclosure "shall with respect to a witness who is retained or specially employed to provide expert testimony, be accompanied by a written report prepared and signed by the witness." Certain courts have held that treating physicians do not fall into this category and, thus, an expert report is not required from a treating physician. *Phillips v. Occidental Chemical Corp.*, 2000 WL 1092857 *2 (E.D. La. 2000), *citing Sullivan v. Glock, Inc.*, 175 F.R.D. 497 (D. Md. 1997).

In the instant matter, Dr. Serio is not considered Campbell's treating physician. Rather, Campbell was seen by Dr. Serio on three occasions to be cleared for work at Morrison. As a result, any testimony by Dr. Serio beyond the three physical appointments would be considered expert opinion requiring an expert report. Morrison failed to provide an expert report and gave

---

a trial 'less a game of blind man's b[l]uff and more a fair contest.'" *Chaisson*, 988 F.2d 513, *citing United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958).

no reason for its failure. By failing to provide such a report, Campbell was denied the opportunity to present an opposing expert opinion. For these reasons, the Court ruled the expert opinion testimony of Dr. Serio was inadmissible, and limited his testimony to the facts relating to the three physical visits.

### B. Morrison's Motion in Limine

On March 15, 2012, Morrison filed a motion in limine seeking to exclude the expert reports of Dr. Mark Mellinger, Campbell's treating physician, and Dr. John Hildenbrand, an orthopedic surgeon. Morrison reasons that these reports were untimely submitted past the expert report deadline, January 27, 2012, and discovery deadline, February 26, 2012. The Court heard argument and ruled on this matter on the first day of trial.

On February 28, 2012 and April 17, 2012, Dr. Mellinger provided a letter and report, respectively, setting forth various recommendations and opinions. Dr. Hildenbrand, who provided various opinions with respect to Campbell's work capabilities, provided an undated report that was only first sent to Morrison's counsel on March 8, 2012. Morrison contends these reports should be excluded, as they were produced well beyond the deadline for submission of expert reports.

In opposition, Campbell contends that, with the exception of the April 17, 2012 progress note by Campbell's treating physician, the other reports objected to were all generated before, and identified in, the Pre-Trial Order filed on March 20, 2012. Significantly, Morrison did not object to the above-mentioned reports and witnesses in the Pre-Trial Order, which requires the parties to object to any witnesses listed by the opposing party. Campbell further contends that the April 17, 2012 progress note should be allowed since Dr. Mellinger is Campbell's treating physician and it was generated in the ordinary course of treatment.

The undersigned finds that Morrison should have objected to the untimely reports in the Pre-Trial Order. Although the reports were untimely, they were still presented to Morrison within a reasonable time frame, providing Morrison an opportunity to rebut these reports. Moreover, while Dr. Mellinger is Campbell's treating physician, it was Dr. Shults, the physician chosen by Morrison, who referred Campbell to Dr. Hildenbrand. Given that these reports were produced before the Pre-Trial Order, not objected to in the Pre-Trial Order, and was given by Campbell's treating physician and a physician referred by Morrison's physician of choice, the Court denied Morrison's motion in limine and admitted the reports.

**V. Analysis**

**A. Jones Act Seamen**

The Jones Act allows an injured seaman to bring a personal injury action against his employer. 46 U.S.C. § 30104. However, an injured plaintiff first has the burden of establishing Seaman status. *See Becker v. Tidewater*, 335 F.3d 376 (5th Cir. 2003). To determine if an individual worker is a seaman, and therefore entitled to the protections of the Jones Act, the Supreme Court has established a two-prong test: (1) "'an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission,'" and (2) "'a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature.'" *Id.* at 387, *quoting Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). The Fifth Circuit has consistently conferred seamen status on commercial divers because it is "the inherently maritime nature of the tasks performed and perils faced by his profession, and not the fortuity of his tenure on the vessel from which he makes the particular dive on which he was injured, that makes [the commercial diver] a seaman." *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 436 (5th Cir. 1984); *see Pickle v. Int'l Oilfield Divers, Inc.*,

791 F.2d 1237, 1240 (5th Cir. 1986); *Moore v. SubSea Int'l, Inc.*, 1997 WL 779016, *2 (E.D. La. 1997).

In the instant matter, there is no doubt that Campbell was a Jones Act Seamen. Campbell was employed by Morrison from June 1, 2008 until October 26, 2010. During his employment, Campbell spent most of his time aboard an identifiable group of vessels owned and/or operated by Morrison, all of which was substantial in both duration and nature. Furthermore, Campbell's duties contributed directly to the function and accomplishment of the mission of the vessels he was aboard. The Court also notes that counsel for Morrison conceded that Campbell is a Jones Act Seamen under the law applicable at the time of trial. Therefore, this Court finds Campbell to be a Jones Act Seamen.

### B.   Negligence

Under the Jones Act, an employer may be liable for personal injuries incurred during the course of the seaman's employment if the plaintiff proves the employer's negligence. A seamen has an obligation under the Jones Act to act with ordinary prudence under the circumstances. A seaman's circumstances include his reliance on his employer to provide a safe work environment and his own experience, training and education. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997). Similar to seamen, the duty of care owed by a Jones Act employer is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances. *Id.* at 338-39. Specifically, an employer has an affirmative duty to provide its employees a reasonably safe place to work. *See Ivy v. Security Barge Lines, Inc.,* 585 F.2d 732, 741 (5th Cir. 1978). However, "the employer must have notice and the opportunity to correct an unsafe condition before liability attaches." *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir.

1989). "The standard of care is not what the employer subjectively knew, but rather what it objectively knew or should have known." *Id.*

To prove employer negligence, the seaman must prove that the employer breached a duty owed to the seaman and that the breach was a cause of his injuries. *See Davis v. Hill Engineering, Inc.*, 549 F.2d 329, 331 (5th Cir. 1977), *overruled on other grounds in Gautreaux,* 107 F.3d 331. The standard for causation in a Jones Act case is minimal: "a defendant must bear responsibility for his negligence if such negligence played any part, even the slightest, in producing the injury." *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984), *citing Chisholm v. Sabine Towing & Transportation Co.*, 679 F.2d 60, 62 (5th Cir. 1982). Thus, the plaintiff's burden to prove causation is "very light" or "featherweight." *In re Cooper/T. Smith*, 929 F.2d 1073, 1076 (5th Cir. 1991), *citing Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142 (5th Cir. 1975).

Foremost, the Court finds Campbell to be a straight-forward and credible witness.[9] As a result, the Court accepts Campbell's testimony with regard to his accident and the extent of his resultant injury. Similarly, given his demeanor and responses to both counsels and the undersigned, the Court finds Jones to be a straight-forward, honest, and credible witness. Campbell proffers several theories of negligent liability on the part of Morrison and each will be discussed in turn.

---

[9] During Campbell's cross-examination, evidence was revealed showing that Campbell failed to truthfully fill out his medical paperwork by failing to divulge prior medical conditions, such as a lower back injury while in the military, a PTSD diagnosis, high blood pressure and a hearing problem. Campbell testified that none of these conditions were ever treated for, which is bolstered by the fact that he was on the Navy Parachute team *after* his alleged back injury. These prior conditions were included in Campbell's responses to Morrison's interrogatories. Although Morrison argues that it would not have hired Campbell had it known about these prior conditions, no evidence, treating physician testimony, or expert testimony was presented substantiating that fact. Furthermore, Campbell's medical falsehood and prior conditions had no bearing on Campbell's ultimate finger injury. As a result, the Court refuses to diminish Campbell's credibility based on his medical paperwork.

17

Campbell alleges that Morrison is negligent for failing to provide pneumatic tools to remove and replace the ball valves. We agree. Although evidence was presented that rusted ball valves and flanges often require hammers to break them loose, significant evidence and testimony was presented that pneumatic tools are a safer and faster alternative to getting the job done. Specifically, in addition to Mr. Perkin's testimony in this regard, Jones testified that pneumatic tools quicken the process of breaking the flanges apart and would have completed the job faster. This is further evidenced by the relief crew bringing in pneumatic tools after Campbell's injury to complete the job. Additionally, testimony was presented that bringing the pneumatic tools would have been a very simple task, taking only "minutes" as Jones stated. Morrison asserts that rusted ball valves require hammers and hammer wrenches to break them loose. However, Mr. Perkin testified that tools such as electric over hydraulic or pneumatic over hydraulic tools break rusted bolts in a much safer manner. Even if electric over hydraulic or pneumatic over hydraulic tools were not used, Morrison could have utilized hammers and hammer wrenches to break the flanges loose if necessary, and *then* employed pneumatic tools to complete the removal and replacement of the ball valves. Instead, Morrison required Campbell and Jones to use hammers and hammer wrenches for three exhausting hours, requiring the men to take numerous breaks. Morrison's decision was unsafe and inefficient. Accordingly, the Court finds that Morrison's failure to provide pneumatic tools was unreasonable and a proximate cause of Campbell's injury.

Morrison's failure to provide pneumatic tools also led to significant fatigue. Both Campbell and Jones testified that using the hammers and hammer wrenches for three hours was hard physical labor, leading to exhaustion. In fact, after approximately two and half hours of using the hammer and hammer wrenche, Jones testified he was fatigued and inquired into using

18

pneumatic tools. Hively and Allsbrooks both denied Jones's request for pneumatic tools and stated that the relief crew would bring them. Jones admitted that after he became fatigued, use of pneumatic tools would have made his job of loosening the bolts easier.  Campbell and Jones's fatigue is further evidenced by Allsbrooks' decision to assist the men in using the hammer and hammer wrench to break apart the flanges. Furthermore, Campbell and Jones's fatigue is evidenced by Hively's testimony that around 11:00 p.m., after hours of swinging the hammers and hammer wrenches, he telephoned the relief crew to bring the pneumatic tools. The Court finds that both Campbell and Jones were significantly fatigued by swinging a twelve-pound hammer for three hours instead of using pneumatic tools, and such fatigue and failure to provide pneumatic tools was unreasonable and a proximate cause of Campbell's injury.

Morrison similarly failed to provide Campbell and Jones a compressor to operate pneumatic tools. Testimony revealed that Morrison's vessel had two compressors on it; however, both were in use and could not be brought to the platform. The undersigned finds that Morrison could have solved this issue in a number of ways. For example, knowing that it had a job to perform on the East Cameron 328B platform, Morrison could have brought a third compressor on board the vessel. If Morrison did not own a third compressor, Hively admitted that Morrison could have rented a third compressor to bring aboard the vessel. In fact, Jones testified that even a smaller compressor, three-by-five feet, could have supported the pneumatic tools and could have fit on the tug boat. Even if these two options failed, the platform compressor could have been secured prior to leaving the vessel and reaching the platform. Significantly, Hively, the supervisor on the task, testified that he had radio contact with the platform, and, in fact, called the platform before heading over on the tug boat. Even after his project manager informed him there was a compressor on the platform, Hively testified he did not inquire into the compressor's

availability when he called the platform. Instead of communicating with the platform regarding the use of the compressor, Hively waited until he reached the platform to begin discussions of the compressor so that the negotiations were "face-to-face." Not unexpectedly, it took Hively an inordinate amount of time to negotiate the use of the compressor, all while Campbell and Jones were engaged in exhausting physical labor. Even after Hively secured the compressor, he did not inform Jones and Campbell since that would provide false hope of using pneumatic tools that were not even available. Nothing about this fact pattern adds up. The Court finds that Morrison's failure to secure a compressor prior to Campbell's injury was unreasonable under the circumstances and a proximate cause of Campbell's injury.

A separate issue of liability involves the unsafe work area. Testimony was clear that the work area was confined and that Campbell and Jones were required to find awkward footing. While Campbell had one foot atop the other on a triangular gusset, Jones had one foot on a riser clamp and the other on a circular standoff pipe. According to Morrison, it is Campbell's choice of footing that led to his injury. However, the only other option would have been for Campbell to put one foot on a standoff, as Jones and Allsbrooks did, which is in clear violation of Morrison's safety policy and general industry practice. As a result, the Court finds that Campbell found the only other alternative to place his feet. The undersigned agrees with Campbell's expert, Mr. Perkin, in that this work area was simply "not a working surface." Even if scaffolding would not have fit in the confined space, as Morrison argues, some other type of support structure should have been implemented. The Court finds that the footing provided to perform this project was unsafe and unreasonable and a proximate cause of Campbell's injury.

Campbell further argues that Morrison is negligent for failing to properly supervise the work occurring at the time of the injury. This failure is readily apparent from the testimony

presented at trial. Both Hively and Allsbrooks held supervisory titles and were at the job site in a supervisory capacity. Once Campbell, Jones, Hively and Allsbrooks arrived at the platform, Campbell and Jones were given a standard platform safety meeting and a "tool box safety meeting." Neither Hivley nor Allsbrooks instructed Campbell or Jones on how to remove and replace the ball valves. Similarly, neither Hively nor Allsbrooks instructed the men on where to stand or how to place their feet during the task. Morrison points to Campbell's testimony to argue that Campbell was experienced with hammers and hammer wrenches and did not need instruction on how to operate these tools. However, the Court finds that the men required instruction beyond operation of the tools, particularly, how to stand and swing the hammer. This lack of instruction confers liability on Morrison's part. Additionally, Morrison failed to supervise the work being performed when it failed to stop the project. Hively and Allsbrooks both testified that had they known that the men were swinging their hammers overhead, they would have shut down the job. The Court is highly skeptical of Allsbrooks' testimony in this regard since he was assisting Jones and Campbell under the elevation of the platform and, ostensibly, observed the men swinging the hammer overhead. Knowing how work is being performed is a supervisor's job and, here, they failed at it. The Court finds that Hively should have known how the work was being performed, and Allsbrooks in fact knew how the work was being performed, and should have stopped the job. Moreover, once Hively and Allsbrooks saw Jones and Campbell's fatigue, they should have stopped the job. For these reasons, the Court finds that Morrison unreasonably failed to supervise the work and this failure was a proximate cause of Campbell's injury.

Lastly, Campbell contends Morrison is negligent for failing to provide adequate lighting. The Court does not find the lighting for the work area to be an issue of liability. The overall testimony by Hively, Allsbrooks, and Jones seems to submit that the lighting, albeit not bright,

21

was nonetheless adequate to perform this job. This is further evidenced by the work being performed for three hours prior to Campbell's injury. The Court does not find the lighting at the job site led to Campbell's injury. Therefore, this Court denies Morrison retains liability for the lighting on the night of the accident.

Morrison asserts that liability should attach to Campbell for his foot placement and for failing to call an All-Stop to the project. With regard to the foot placement, which was discussed fully above, the Court does not confer liability on Campbell since Campbell chose the only other alternative to breaking company policy. *Courville v. Cardinal Wireline Specialists, Inc.*, 775 F.Supp. 929, 937 (W.D. La. 1991) ("[o]nly where it is shown that there existed a safe alternative available to him of which he knew or should have known, can a seaman's choice of an unsafe course of action be properly considered in determining whether he was negligent.") With regard to stopping the project, Morrison argues that at no time did Campbell inform his supervisors he felt the job was unsafe or request the job to stop. However, a "seaman is not contributorily negligent merely because he uses an unsafe tool or appliance or proceeds in an unsafe area of the ship" and, therefore, Campbell cannot be contributorily negligent for balancing while swinging an unsafe and heavy hammer and hammer wrench for three hours. *Id.* The Court rejects Morrison's contentions. The Court finds that Campbell acted reasonably under the circumstances and that no conduct by Campbell was a proximate cause of his injury. Accordingly, the Court finds Morrison 100% negligent for Campbell's injury.

**C.   Unseaworthiness**

A Jones Act seaman may also sue the owner of the vessel he is working off of for breach of the warranty of seaworthiness. *Becker*, 335 F.3d at 387. "A shipowner has an absolute nondelegable duty to provide a seaworthy vessel." *Brister v. AWI, Inc.*, 946 F.2d 350, 355 (5th

Cir. 1991). A seaworthy vessel is one where the vessel, its crew, appurtenances and operation are reasonably fit for the vessel's intended purpose. Accordingly, to prove a vessel is unseaworthy, a plaintiff must prove that the defendant provided a vessel (including its appurtenances, gear and equipment) not reasonably fit for its intended purpose. *Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992). The mere fact that an injury occurred does not establish that the vessel was unseaworthy. *See id*. Rather, the plaintiff must show that the unseaworthy condition played a "substantial part" in plaintiff's injury, and that the "injury was either a direct result or a reasonably probable consequence of the vessel's unseaworthiness." *Id*.

Similar to the arguments discussed above, Campbell contends that Morrison's vessel was unseaworthy due to inadequate equipment to safely perform the assigned task, such as compressors, pneumatic tools and scaffolding. The Court agrees with this argument, but limits the breach of warranty to the lack of an additional compressor on board the vessel. The Court resubmits the reasoning asserted above in support of this conclusion and finds that the lack of compressor on board the vessel made this vessel unfit for its intended purpose. Pneumatic tools were present on the vessel and thus, the vessel, itself, was seaworthy. With regard to the scaffolding, the Court is not convinced that scaffolding would have been a viable option for the confined working space given the conflicting testimony presented at trial. Therefore, the Court finds that the unseaworthy condition of the JoAnn Morrison, in failing to have an additional compressor, played a substantial part in causing Campbell's injury, which was both a direct result and a reasonably probable consequence of the vessel's unseaworthiness.

23

### D.   Damages

Under the Jones Act, an injured seaman is entitled to monetary recovery for past, present, and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence. Thomas J. Schoenbaum, Admiralty and Maritime Law §§ 5-15, 6-18 (4th ed. 2004); *Nicholas v. Weeks Marine, Inc.*, 513 F.Supp.2d 627, 637 (E.D. La. 2007). With the exception of monetary awards for future pain and suffering, future losses (income and medical expenses) must be discounted to present value. *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983). Future losses of income must also reflect a judgment to net, after tax, value. *Id.*  A seaman is required to mitigate his damages, but the burden of showing the injured party failed to mitigate his damages rests with the defendant. *Kratzer v. Capitol Marine Supply, Inc.*, 645 F.2d 477, 483 (5th Cir. 1981).

### 1.   *Economic Loss*

Past lost earnings are usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial. Thomas J. Schoenbaum, Admiralty and Maritime Law §§ 5-15.1 (4th ed. 2004). In *Culver*, the Fifth Circuit established a four-step process for determining future lost wages: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount the total present value. 722 F.2d at 117.

Campbell testified that as a dive tender, he was earning approximately $38,000.00 annually.[10] However, the first issue that must be decided to determine economic loss is whether Campbell can return to work as a dive tender. This issue is in dispute. Campbell's witnesses,

---

[10] There were several different income amounts presented at trial by different witnesses. However, this Court will use Campbell's own account of his income.

24

including Campbell's vocational rehabilitation expert (Stephanie Chalfin) and three orthopedic surgeons (Drs. Shults, Hildebrand, Mellinger) all concluded that, given the dive tender job description, Campbell could not return to work as a diver. Conversely, Morrison's orthopedic surgeon expert, Dr. Donald Faust, concluded that Campbell could return to work as a diver. However, Morrison's own vocational rehabilitation expert, Dr. John Grimes, testified that a person with moderate to severe pain in his or her finger cannot function as a diver, whose duties involve heavy, hazardous and physical work.  Given the evidence of Campbell's pain and limitations in his finger, the Court finds that Campbell cannot return to work as a diver, a job that ostensibly requires fluid and constant movement of one's hands and fingers.

Both vocational rehabilitation experts agreed that Campbell is well-suited for a career as a radiography technician, making approximately $56,813.00 annually. Dr. Grimes testified that this position will allow Campbell to learn a new skill in an industry where he can progress. In fact, Campbell testified that he will begin a two-year program in September 2012, completing his required schooling for this career in September 2014.  The Court agrees this profession is suitable for Campbell and will assume that Campbell attends school and becomes a radiography technician in September 2014.

Another contentious issue requiring resolution is whether Campbell would have earned more income at Morrison as a diver, saturation diver, and dive supervisor but for his injury. Campbell testified that it was his goal to rise in the ranks and become a dive supervisor. Testimony was presented arguing that dive tenders, such as Campbell, generally break out as divers after three years of good employment, making approximately $90,000.00 to $95,000.00

annually.[11] At the time of his injury, Campbell had been a dive tender for Morrison for two and a half years, meaning that Campbell likely would have broken out as a diver after approximately six additional months, earning significantly more income. Additional testimony was presented that after a few years divers are promoted to saturation divers, earning between $130,000.00 to $140,000.00. Again, after a certain amount of time, saturation divers are promoted to dive supervisors.

Campbell asks this Court to calculate his damages as if he were to obtain all of the promotions listed above. Although the Court found that Campbell was a satisfactory employee, the Court is unable to affirmatively find that Campbell would become a saturation diver or dive supervisor. Ms. Chaflin testified that only a small percentage of divers become saturation divers. Dr. Grimes similarly testified that the diving industry has a high attrition rate that increases as an employee rises in the ranks. As a result, the facts are simply too tenuous to assume Campbell would become a saturation diver and thereafter a supervisor. The Court is willing to assume, however, that after six additional months of employment, Campbell would have broken out as a diver in April 2011, earning approximately $90,000.00 annually until September 2014 when Campbell begins to earn a salary as a radiography technician. Thereafter, the difference in his

---

[11] John DeBlieux, Morrison's Commercial Manager in Human Resources, testified that in 2009 divers earned $80,000.00 annually and that this amount decreased by eighteen percent in 2011, where divers were making approximately $67,200.00. The Court refuses to accept DeBlieux's testimony for several reasons. First, DeBlieux's credibility is highly questionable. The Court found Deblieux to be an arrogant witness who gave snarky and sarcastic answers at trial. DeBlieux's wise-guy demeanor did not impress the Court. Second, it was clear that Morrison called DeBlieux to testify as a last-ditch effort to contradict the testimony of all of the witnesses, including current Morrison employees. For example, even Hively, who has been with Morrison for over six years, testified that divers earn approximately $90,000.00 to $95,000.00 annually. Furthermore, Allsbrooks, who was promoted from tender all the way to saturation supervisor in six short years, testified that his earnings were in the "upper 90s" as a diver. As a result, the majority of testimony conflicts with DeBlieux's testimony and reveals that divers earn approximately $90,000.00 to $95,000.00 annually. Finally, DeBlieux testified as to several data numbers, including salaries, number of divers at Morrison, and age ranges of divers; yet, he brought nothing to substantiate his findings. DeBlieux could have very easily brought documentation to verify his testimony, however, he chose not to do so. As a result, the Court is highly skeptical of DeBlieux's alleged findings. Based on all of these reasons, the Court gives no weight to DeBlieux's self-serving testimony.

26

salary as a diver and radiological technician for 32 years until retirement will become part of his

economic loss. The Court's analysis is summarized below.

- .5 years as dive tender making $38,000.00 yearly =                    $19,000.00
    - [10/10 to 04/11]
- 3.42 years as a Diver making $90,000.00 yearly =                      $307,500.00
    - [04/11 (date becomes diver) to 09/14 (radiological technician)]
- $90,000.00 - $56,813.00 = $33,187.00 (yearly lost wages) x  32 years=   $1,061,984.00
    - [(Diver salary) – (Technician salary) x (Years until retirement)]
- Total Economic Loss =                                                 **$1,388,484.00**

### 2. Pain And Suffering

A damage award for pain and suffering may include a sum for mental anguish and

physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability

to engage in activities that normally contribute to the enjoyment of life. Thomas J. Schoenbaum,

Admiralty and Maritime Law §§ 5-15.3, 6-18.4 (4th ed. 2004). These types of damages are not

subject to precise measurement. *Id.* Any amount awarded generally depends on the trial court's

observation of the plaintiff and its subjective determination of a reasonable amount needed to

achieve full compensation. *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir. 1983). Such

an award also depends on the facts of the particular case. *Allen v. Seacoast Products, Inc.*, 623

F.2d 355, 356-65 (5th Cir. 1980).

In this case, the Court observed Campbell wincing while exhibiting the motion range of

his injured index finger. Campbell testified that he has severe pain on a daily basis when moving

his injured finger, especially when his finger unintentionally hits an object, or he rolls over in his

sleep. Campbell testified that this pain is constant and most often prevents him from enjoying his

hobbies, such as outdoor activities. He also testified that his pain causes debilitating heachaches,

which ultimately affects his home life. Based on Campbell's testimony, the Court sees it fit to

award him $150,000.00 for his pain and suffering.

3. *Future Medical Damages*

The only evidence regarding potential future medical expenses presented to the Court was Campbell's medication, costing approximately $700.00 monthly or $8,400.00 yearly. However, no evidence was presented regarding how long Campbell is estimated to take this medication in the future. Furthermore, although Dr. Mark Mellinger has recommended additional surgery and psychological treatment, Campbell testified that he did not intend on undergoing any additional surgery. Campbell did testify that he will continue physical therapy treatments, but again, no evidence was presented as to this treatment's cost or Campbell's intended regularity of treatment. As a result, calculating Campbell's future medical damages is too arbitrary. The Court does not award any damages for Campbell's future medical costs.

## VI. Conclusion

Considering all of the evidence presented, including voluminous exhibits, testimony presented at trial, and a read-through of the trial's rough transcript, the Court finds Morrison 100% negligent for Campbell's injury due to Morrison's failure to supervise, failure to provide a compressor and pneumatic tools, and failure to provide a safe working space. The Court further finds the JoAnn Morrison to be unseaworthy for failure of providing a compressor on board the vessel. For these reasons, the Court awards Campbell $1,538,484.00 in damages.

**THUS DONE AND SIGNED** at Lafayette, Louisiana on this ___24th___ day of July, 2012.

HONORABLE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

28